JACK WECHSLER v. BEN NOVAK and BELLA NOVAK, his wife; CHARLES COHEN and FRANCES COHEN, his wife; DAN LEVEN-SON and ETHEL LEVENSON, his wife; a partnership, collectively and individually, formerly trading and doing business as the Atlantis Hotel.

26 So. (2nd) 884

July 12, 1946

Rehearing denied July 31, 1946

June Term, 1946

En Banc

*J. Lewis Hall* and *George Schwartz,* for appellant.

*Harold Kassewitz* for Ben Novak and Bell Novak, his wife, *Bernstein & Hodsdon* for Charles Cohen and Frances Cohen and *Shutts, Bowen, Simmons, Prevatt & Julian,* for Don Levinson and Ethel Levinson, his wife, appellees.

CHAPMAN, C. J.:

The plaintiff below in his declaration alleged, in part, that on or about June 15, 1943, the defendants were engaged in operating the Atlantis Hotel at Miami Beach, Florida, and the hotel at the time was leased to the United States Army and the defendants were desirous of having the hotel returned to civilian use; that on the 20th day of June, 1943, the defendants employed the plaintiff to obtain information and assist in securing the return of the hotel to civilian use; the defendants promised and agreed in consideration of the services to be performed and money spent and subsequent services to be performed in the event the Atlantis Hotel was returned to civilian use that they would pay the plaintiff the sum of $10,000.00.

The sum of $5,000.00 would be paid on December 15, 1943, provided said hotel was returned for civilian use on or before December 15, 1943, and the remaining $5,000.00 was to be paid on or before January 15, 1944, plus a bonus equal to 10% of all the gross profits resulting from the operation of the hotel from the date the hotel would be opened and returned for business until January 1, 1945, or in the event the hotel was sold prior to January 1, 1945, the plaintiff was to receive 10% of the gross profits of the sale in addition to the 10% of the gross profits accruing prior to the sale of the Atlantis Hotel.

The plaintiff rendered certain services to the defendants at their request. He appeared before the United States Army Real Estate Board in Washington, D. C., on dates viz: June 27, 1943; July 11, 1943; September 5, 1943, and October 4, 1943; and assisted the defendants in securing information as to the possibilities of having the hotel released from the Army; the plaintiff reported to the defendants what had transpired at the respective hearings before the United States Army Real Estate Board and the total amount of his expenditures incident to the return of the hotel to the defendants approximated $3500.00, and this expenditure was made in accordance with the terms of his contract of employment with the defendants. On November 12, 1943, plaintiff notified defendants that the hotel would be returned to civilian use and they would receive within a few days an official notice thereof through the proper authorities of the United States Army.

The plaintiff had performed and complied with all the terms and conditions of the contract of employment existing between them and as a result of plaintiff's efforts the Atlantis Hotel on or about December 12, 1943, was returned to the defendants, yet the defendants refused and failed to pay the plaintiff the sum of $50,000.00 cash. The common counts were viz: for work done and materials furnished at defendant's request; and for money found to be due on accounts stated between them in the total sum of $50,000. A bill of particulars in the total sum of $50,000.00 by appropriate words was made a part of the declaration.

The several defendants by their respective attorneys filed separate demurrers to the declaration and some of the grounds are common to each demurrer, viz: (1) the declaration fails to state a cause of action; (2) the original contract sued upon is so vague, indefinite and uncertain that it is incapable of enforcement; (3) the original contract sued upon is contrary to public policy, illegal and void in that the plaintiff was therein seeking compensation for exerting influence upon public officials of the United States Government; (4) it is not shown that the plaintiff performed any services for which he was entitled to be paid; (5) it is impossible to determine the exact services rendered by the plaintiff for which he seeks compensation; (6) it appears from the allegations of the declaration that the compensation plaintiff was to receive for the services rendered was and is contrary to public policy. Final judgment on demurrers for the defendants below was entered and plaintiff appealed.

Counsel for appellant pose for adjudication here the question, viz: Where it appears that the plaintiff was employed to assist in the procurement of the release from Army occupation of a hotel and the plaintiff had rendered services and had expended money in his efforts therefor and the defendants orally agreed, in consideration of the services rendered and to be rendered, in the event the hotel was returned, that they would pay to the plaintiff the sum of $10,000.00, in cash, for the services therefor, is such a contract contrary to public policy and void?

Counsel for appellees contend that the question presented

here is viz: Is an alleged contract entered into in June, 1943, (during the middle of World War II) to procure from a contingent compensation the release from the United States Army and the return to the owner of a hotel at Miami Beach occupied by soldiers, illegal and void as a contract contrary to public policy?

The early case of Providence Tool Company v. Norris, 69 U.S. 45, 17 L. Ed. 868, involved a contract entered into between the Secretary of War and the tool company providing for the delivery of 25,000 muskets of a specified pattern for $20.00 each, and the muskets were to be delivered by a certain date. The contract was obtained through the exertions of Norris with an agent of the tool company, and it was agreed that if Norris would obtain the contract from the War Department then he (Norris) would receive stipulated compensation to be paid to him by the tool company. Norris brought suit and the court held that he could not recover because his contract was against public policy and therefore invalid. It was said, "Agreements for compensation contingent upon success, suggest the use of sinister and corrupt means for the accomplishment of the ends desired. The law meets the suggested evil and strikes down the contract from its inception. There is no difference in principle between agreements to procure favors from legislative bodies and agreements to procure favors in the shape of contracts from the heads of departments."

The case of Trist (Burke v. Child, 88 U.S. 441, 22 L. Ed. 623, involved a claim of Trist against the Federal Government for services rendered touching the treaty of Guadelupe Hidalgo and he entered into an agreement with Child to the effect that Child would take over the claim and prosecute it before Congress and the compensation for his services would be 25% of such sum as Congress might allow in payment of the claim. Congress appropriated the sum of $14,559.00 to pay the claim. Trist died and Child brought suit to collect the 25% of the sum appropriated. The Court, in holding that the contract was contrary to public policy and therefore void, in part, said:

" . . . The theory of our government is, that all public sta-

tions are trusts, and that those clothed with them are to be animated in the discharge of their duties solely by considerations of right, justice, and the public good. They are never to descend to a lower plane. But there is a correlative duty resting upon the citizen. In his intercourse with those in authority, whether executive or legislative, touching the performance of their functions, he is bound to exhibit truth, frankness, and integrity. Any departure from the line of rectitude in such cases is not only bad in morals, but involves a public wrong. No people can have any higher public interest, except the preservation of their liberties, than integrity in the administration of their government in all its departments."

The case of Oscanyan v. Winchester Repeating Arms Co., 103 U.S. 261, 26 L. Ed. 539, was an action to recover money alleged to be due to the plaintiff on a contract with the defendant as commissions on sales to the Turkish Government effected through the efforts of plaintiff. The sales were made while the plaintiff was an officer of the Turkish Government and through plaintiff's personal contact with the Turkish agent. At the trial the plaintiff made an opening statement, and at the close of this opening statement the defendant moved for a direct verdict, which motion was granted by the trial court. The Supreme Court upheld the trial court. Although the question of illegality was not raised by demurrer, a directed verdict was granted after the plaintiff's opening statement without the taking of any testimony. The Court, in part, said:

"It is legitimate to lay before the officers authorized to contract, all such information as may apprise them of the character and value of the articles offered, and enable them to act for the best interests of the country. But where, instead of placing before the officers of the governments the information which should properly guide their judgments, personal influence in the means used to secure the sales and is allowed to prevail, the public good is lost sight of . . . "

McMullen v. Hoffman, 174 U.S. 639, 19 S. Ct. 839, 43 L. Ed. 1117, involved a contract held to be contrary to public policy and invalid. The contract recited that whereas Hoffman and Bates have with the assistance of McMullen at a recent

bidding . . . submitted the lowest bid for said work and expect to enter into a contract with the Water Committee of the City of Portland for doing such work . . . the said Hoffman and McMullen shall and will share said contract equally, inclusive of the profits and losses . . . Pursuant to the agreement Hoffman put in a bid for the work at the sum of $465,722.00, while McMullen's bid was for the sum of $514,664.00, and Hoffman was the lowest bidder and got the contract. McMullen sued on his contract with Hoffman for one-half of the profits. The Court held the contract invalid because it was obtained through fraud and contrary to the public policy.

The inherent and inalienable right of every man to enter into contracts or refuse so to contract is not only recognized but well established. Competent persons have the utmost liberty of contracting and when these agreements are shown to be voluntarily and freely made and entered into, then the courts usually will uphold and enforce them. The general right to contract is subject to the limitation that the agreement must not violate the Federal or State constitutions or state statutes or ordinances of a city or town or some rule of the common law. Individuals have never been allowed to stipulate for iniquity. The doctrine relating to illegal agreements is founded on a regard for the public welfare and therefore each contract must have a lawful purpose. 12 Am. Jur. Par. 149.

Agreements entered into against the public interest or contrary to the public policy of a State or Nation usually are by the courts held illegal and void. The legality of agreements to influence administrative or executive officers or departments is to be determined in each case by weighing all the elements involved and then deciding whether the agreement promotes corrupt means to accomplish an end or to bring influence to bear on public officials of a nature other than the advancement of the best interest of government. Agreements employing one to secure government contracts or concessions, etc., may be without taint on the face and yet illegal or unenforceable. 12 Am. Jur. 709, Par. 206.

A contract involving the use of personal influence with public executives or administrative officers or the heads of

departments in order to induce them to grant favors or privileges, as a general rule, is regarded as against public policy. Many courts hold such agreements invalid on the theory of their tendency to introduce corrupt means in the influencing of public officials and especially is it true in those cases where compensation is contingent on success. 17 C.J.S. 577, Par. 214. See Williston on contracts, Vol. 6 (Rev. Ed.) 4876-4942, Pars. 1726-1746.

The case of Atlantic Coast Line R. R. Co. v. Beasley, 54 Fla. 311, 45 So. 761, involved a contract between a railroad and one of its employees, by the terms of which the employee released a claim, in advance, for personal injuries. We held that the contract offended the rule against public policy. The case of Ware v. City of Leesburg, 113 Fla. 760, 153 So. 87, involved certain transactions for the purchase of bonds of a bank by the bond trustees of the City of Leesburg and we held the transaction void as against public policy. Smith v. Daffin, 115 Fla. 418, 155 So. 658, and Smith v. Jackson, 129 Fla. 787, 176 So. 858, have been carefully considered.

The case of Edwards v. Miami Transit Co., 150 Fla. 315, 7 So. (2nd) 440, involved a written agreement whereby Edwards was to render services in an effort to secure a franchise over the streets of the City of Miami. The plaintiff obtained the bus franchise for the defendant and the latter declined to pay the stipulated compensation when Edwards sued. Edwards submitted to the officials facts, figures and information sufficient to convince the authorities that the general public interest would be served by granting the bus franchise. These facts are distinguishable from the facts presented in the case at bar.

It must be admitted by the parties here that at the time (June 20, 1943) the agreement was entered into that the United States Government was engaged in a bitter and desperate war with powerful enemies; that many points in Florida had by the Federal Government been fortified and otherwise prepared against possible invasion by the public enemy; cautious measures were continuously exercised for protection of the American people; our troops were housed in tourist hotels at Miami Beach. It was a time when all citizens were

expected to sustain every effort to conquer or overcome the enemy. The opportunities of self-aggrandizement and personal gain were secondary objectives. The agreement sued upon here not only violates the rule against public policy and therefore void, but it is reasonable to conclude that the shifting of our troops from the Atlantis Hotel could have given an invading enemy an advantage not anticipated. If the plaintiff had the power or influence to obtain a return of the Atlantis Hotel—then by analogy other hotels on the Miami Beach likewise could be returned. Thus the prosecution of the war indirectly could be adversely affected. We fail to find error in the record.

Affirmed.

TERRELL and BUFORD, JJ., concur.

BROWN, THOMAS and SEBRING, JJ., concur specially.

ADAMS, J., dissents.

BROWN, J., concurring specially:

The large amounts of this allegedly agreed compensation, and the fact that it was conditioned upon success in getting favorable action by the board in Washington, inclines me to agree to the foregoing opinion. The mere employment by a person, or corporation, or a city, of some competent person to represent them and to present legitimate arguments before any one of the many boards and commissions in Washington, in order, if possible, to get favorable action by such a board on any matter vitally important to the protection of their legitimate interests, would seem to be not only lawful but, frequently, vitally necessary.

CHAPMAN, C. J., THOMAS and SEBRING, JJ., concur.

26 So. (2nd) 881                                    June Term, 1946
July 12, 1946                                       Division B